IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                      PLAINTIFF/RESPONDENT

V.                        CASE NO.    5:13-CR-50085-TLB-MEF
                                      5:14-CR-50001-TLB-MEF

JAMES W. BOLT                                 DEFENDANT/MOVANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the Petitioner's Motion to Vacate filed under 28 U.S.C. § 2255 on May 26, 2015. (ECF No. 74)[1]. The Government filed its response on September 22, 2015. (ECF No. 87). Petitioner did not file a reply to the Government's response. An evidentiary hearing was held on September 20-21, 2017. The matter is ready for report and recommendation.

### I. Background

Defendant/Petitioner, James W. Bolt ("Bolt"), was indicted in the Western District of Arkansas, Fayetteville Division, for conspiracy to commit securities fraud, mail fraud, and wire fraud, as well as multiple counts of wire fraud and one count of mail fraud, in Case No. 5:06-cr-50059-JLH.[2] (Government Exhibit 1).[3] Fayetteville attorney Herbert C. Southern ("Southern") was appointed to represent Bolt. The case went to jury trial on March 12-15, 2007, the Hon. Jimm Larry Hendren, U. S. District Judge, presiding. The jury returned a verdict of not guilty on all charges, and

---

[1] Most, but not all, of the ECF documents are filed in both cases. For the sake of brevity, only the ECF document numbers for Case No. 5:13-cr-50085 are referenced.

[2] This prosecution shall be referred to as the "Shimoda" case.

[3] Hereafter, references to the Government's Exhibits shall be by "Gov't. Ex." with the exhibit number following.

a Judgment of Acquittal was entered on March 15, 2007.  (Gov't. Ex. 2).

Five years later, on August 11, 2012, Theodore (Ted) Holder, a Senior Staff Attorney with the Arkansas Securities Department, sent an e-mail to Keith W. Frutiger of the Federal Bureau of Investigation in northwest Arkansas.  (Gov't. Ex. 3).  The e-mail referred to a citizen's complaint about Bolt and raised a concern that "[i]t sounds like this thing is doing what Shimoda Atlantic said it was doing, which is cancer research, i.e., some sort of con game."  Based on the e-mail, a healthcare fraud complaint was opened by the FBI and the matter was assigned to Special Agent Robert Cessario ("SA Cessario") for investigation.  (Gov't. Ex. 4).

On June 24, 2013, SA Cessario applied for and obtained search warrants for Bolt's home at 303 South Rife Drive in Rogers, Arkansas, the business location of Situs Cancer Research Center ("Situs") at 1222 West Poplar Street in Rogers, Arkansas, and a residential property located next to Situs at 1204 West Poplar Street in Rogers, Arkansas.  (Gov't. Ex. 5-10).  Shortly after the execution of the search warrants on June 27, 2013, Bolt called Southern and asked Southern to represent him. Bolt and Southern met at the Situs location later that day, and Southern informed Bolt that he was acquainted with SA Cessario through an unrelated investigation.  Two days later they met at Maestri's restaurant to further discuss Southern's representation of Bolt.  Southern did not believe his acquaintance with SA Cessario posed any conflict of interest, and Bolt agreed, even stating that Southern's acquaintance with SA Cessario may be helpful to Bolt.

On August 29, 2013, a Criminal Complaint was filed against Bolt, alleging that from October 10, 2010 through August 2013 Bolt engaged in a scheme to defraud and to obtain money, by means of false and fraudulent pretenses, representations and promises inducing the State of California, other states, and individual persons to release unclaimed property and money to Situs in the form of a

check or wire transfer. (ECF No. 1, ¶¶ 1-4). Bolt was charged with six counts of mail fraud, in violation of 18 U.S.C. § 1341 (ECF No. 1, ¶¶ 5-6); four counts of wire fraud, in violation of 18 U.S.C. § 1343 (ECF No. 1, ¶¶ 7-8); and, two counts of money laundering, in violation of 18 U.S.C. §§ 1957(a) and (d) (ECF No. 1, ¶¶ 9-12). Bolt was arrested on August 29, 2013, and he made his initial appearance before the Hon. Erin L. Setser[4], U. S. Magistrate Judge, on September 3, 2013. (ECF No. 4). Southern appeared as retained counsel for Bolt. (Id.). Following a detention hearing held on September 4, 2013, the Court ordered Bolt to be detained. (ECF No. 7).

On September 18, 2013, Bolt was named in an Indictment charging him with four counts of wire fraud, in violation of 18 U.S.C. § 1343; six counts of mail fraud, in violation of 18 U.S.C. § 1341; and, two counts of money laundering, in violation of 18 U.S.C. § 1957(a) and (d). (ECF No. 8). Bolt appeared with counsel for arraignment on September 23, 2013, at which time Bolt entered a not guilty plea to the Indictment. (ECF No. 11).

On October 30, 2013, Bolt was named in a Superseding Indictment charging him with: five counts of wire fraud, in violation of 18 U.S.C. § 1343; seven counts of mail fraud, in violation of 18 U.S.C. § 1341; and, two counts of money laundering, in violation of 18 U.S.C. § 1957(a) and (d). (ECF No. 14). Bolt appeared with counsel for arraignment on the Superseding Indictment on November 4, 2013, at which time he entered a not guilty plea. (ECF No. 19). Jury trial was set for January 13, 2014. (Id.).

At some point during the prosecution[5], Southern prepared a written Wavier (sic) of Conflict

---

[4] Now Erin L. Wiedemann.

[5] The document is undated, but Southern testified it would have been prepared and signed during Bolt's incarceration in Benton County between August 29, 2013 and Christmas 2013.

and presented it to Bolt.  (Gov't. Ex. 20).  By signing the document, Bolt acknowledged that Southern and SA Cessario had a "working relationship" in an unrelated case in which Southern was a material witness, and Bolt waived any conflict.

Southern visited Bolt at the Benton County Detention Center a total of 21 times during the course of the prosecution.  (Gov't. Ex. 13).  Southern reviewed the Government's discovery materials with Bolt.  During a lengthy conference after Bolt's arrest on the Criminal Complaint, Bolt laid out for Southern his contention that this prosecution was a Government effort to get back at Bolt for its loss in the Shimoda case.  Southern and Bolt had lengthy discussions about how to present that defense at trial.

On November 19, 2013, Southern filed a motion seeking a court order directing the U. S. Marshal Service to transport Bolt to a medical appointment Southern had scheduled for Bolt.  (ECF No. 23).  On November 20, 2013, Judge Wiedemann conducted a telephone conference hearing on the motion.[6]  Benton County Jail Nurse Darla Watson testified that Bolt had been receiving his prescribed medications, and that he had been seen by the jail doctor, as well as a nurse acting under the direction of the doctor, on numerous occasions.  Nurse Watson explained that while Bolt complained of having Lyme Disease, the jail was not able to obtain any medical records verifying that diagnosis.  Bolt was tested for Lyme Disease at the direction of the jail doctor, and the test results were negative.  Full labs were also ordered by the jail doctor to determine the cause of the symptoms Bolt complained of having, and there was nothing in the lab results indicative of Lyme Disease.  Bolt's vital signs were maintained within normal limits.  Nurse Watson stated she had not

---

[6] The telephone hearing has not been transcribed.  Reference to testimony is from the undersigned's review of the audio recording of the hearing.

heard any further medical complaints since November 6, 2013.  Bolt's motion was denied by Order entered on November 20, 2013.  (ECF No. 24).

By Text Only Order, the jury trial in Bolt's case was reset on January 29, 2014.

Bolt was moved to the Washington County Detention Center in Fayetteville, Arkansas in late December 2013.  Southern visited Bolt another 11 times, including a nearly two-hour visit on January 11, a visit on January 13, two visits on January 14, and two visits on January 15, 2014. (Gov't. Ex. 65).  A meeting at the jail was scheduled on January 14, 2014 so Southern and Bolt could discuss a possible plea agreement with AUSA Hines, Assistant United States Attorney Kyra Jenner ("AUSA Jenner"), and Special Agent John Munns ("SA Munns") with the Internal Revenue Service - Criminal Investigations Division.  According to AUSA Hines, the meeting lasted at least two hours or "the better part of an afternoon."

Bolt testified Southern had already told him that he was not prepared for trial, and Bolt asserts this was essentially confirmed in an e-mail Southern sent to AUSA Hines on January 11, 2014.  (Gov't. Ex. 66).  Bolt further asserts that Southern told him what to say on a couple of occasions during the January 14, 2014 meeting "to sell this story to Judge Dawson."  AUSA Hines testified that Bolt was actively engaged in the plea discussions during the meeting, and that it was Bolt who came up with the plan for him to plead guilty to an Information charging one count of money laundering.  Bolt admitted he came up with the idea of pleading guilty to the Information during his change of plea hearing when he stated, "[i]n fact, in the discussions we had I may have been the one that suggested the Information."  (ECF No. 37, p. 6:19-20).  SA Munns also testified that most of the discussion during the January 14, 2014 meeting was by Bolt.  SA Munns noted that Bolt did not express any dissatisfaction with Southern during the meeting, and that it was Bolt who

-5-

came up with the information used for the specific count of money laundering to be charged by Information.

When asked if he pressured Bolt into a guilty plea, Southern stated "absolutely not." He described taking a spectrum or continuum approach to discuss the case with Bolt, i.e., they discussed the likelihood of conviction versus acquittal, and they considered the possible severity of sentence under either scenario. Southern characterized Bolt as having a "very forceful personality." The meeting on January 14, 2014 was something Bolt wanted, and Bolt "drove the train" during the meeting. Southern confirmed it was Bolt who came up with the idea of pleading guilty to an Information charging him with one count of money laundering. Southern also related that Bolt brought up the idea that he could fly one of his airplanes down to Mexico, meet with Joaquin "El Chapo" Guzman, and bring Guzman back to the United States to be turned over to law enforcement. This topic had been earlier addressed in an e-mail Southern sent to SA Cessario on August 8, 2013. (Gov't Ex. 71). The Government was not interested in Bolt's assistance with "El Chapo." Bolt signed a written Plea Agreement on January 15, 2014. (ECF No. 31).

At 1:40 p.m. on January 16, 2014, Bolt appeared with Southern before the Hon. Robert T. Dawson, U. S. District Judge, for a change of plea hearing. Bolt was upset because he learned that the Plea Agreement had been leaked to the press and reported in a local business newspaper. He had reservations about the Plea Agreement, and he testified that Southern pressured him by saying the leaked Plea Agreement would taint the possibility of getting a fair trial. He also testified that Southern counseled him again on how to answer the Court's questions during the change of plea hearing to "sell" the Plea Agreement to Judge Dawson. Southern denied that he pressured Bolt into pleading guilty at the change of plea hearing.

-6-

The written Plea Agreement was presented to the Court, and Bolt pleaded guilty to Count Two (wire fraud) and Count Eleven (mail fraud) of the Superseding Indictment.  Additionally, Bolt agreed to waive indictment by a grand jury, consented to the filing of an Information charging him with one count of money laundering, and he pleaded guilty to the Information.  (ECF No. 30).  The Court accepted the pleas and deferred sentencing pending a presentence investigation.  (Id.).

On February 26, 2014, Bolt filed a *pro se* Motion for Appointment of Counsel.  (ECF No. 32).  Bolt alleged Southern "has been dismissed due to a conflict of interest that has resulted in impairment of the required representation."  (ECF No. 32, p. 1).  Bolt filed a *pro se* Motion for Detention Hearing on the same date.  (ECF No. 33).  The unsworn Declaration of James Bolt was filed in support of Bolt's two motions.  (ECF No. 34).  Two days later, Southern filed his Motion to Withdraw as Counsel.  (ECF No. 35).  Southern alleged Bolt had "created a conflict situation wherein [Southern] cannot reasonably continue to provide legal services ..."  (ECF No. 35, ¶ 1).  More specifically, Southern asserted Bolt made false statements and allegations on the record accusing him of collusion with the Government, unethical behavior, and behavior amounting to a fraud on the Court, all of which Southern denied.  (ECF No. 35, ¶ 2).  The Court granted Southern's Motion to Withdraw as Counsel by Order entered on March 4, 2014.  (ECF No. 36).

Bolt then filed a 17 page Supplemental Declaration in support of his Motion for Appointment of Counsel and Motion for Detention Hearing on March 11, 2014.  (ECF No. 38).  The Government filed a response to these motions on March 14, 2014.  (ECF No. 39).  Judge Wiedemann held a hearing on Bolt's Motion for Appointment of Counsel on March 19, 2014 (ECF No. 41), and by Text Only Order entered on the same date granted the motion and appointed attorney Andrew R. Miller ("Miller") to represent Bolt.

By Text Only Order entered on April 18, 2014, a sentencing hearing was scheduled for June 25, 2014.  On April 25, 2014, Miller filed Defendant's Motion for Release Pending Sentencing or Alternatively a Hearing to Determine Continued Custody.  (ECF No. 43).  The Government's response to Bolt's motion was filed on April 30, 2014.  (ECF No. 44).  A hearing on the motion was held by Judge Wiedemann on May 2, 2014 (ECF No. 45), and the motion was denied.  (ECF No. 46).

An initial Presentence Investigation Report ("PSR") was prepared by the United States Probation Office on May 5, 2014.  (ECF No. 47).  On May 8, 2014, the Government advised that it had no objections to the PSR.  (ECF No. 48).  On May 19, 2014, Bolt advised that he had three objections to the PSR, including objections regarding the loss amount, whether sophisticated means were used to commit the offenses, and to any reported criminal history prior to 1982. (ECF No. 49). The Government filed a response to Bolt's PSR objections on May 20, 2014.  (ECF No. 50).

On November 25, 2015, a final PSR was submitted to the Court.  (ECF No. 51).  The Probation Officer addressed, and rejected, Bolt's objections in an Addendum to the PSR.  (ECF No. 51-1).  The final PSR determined that Bolt's conduct called for a base offense level of seven.  (ECF No. 51, ¶ 101).  Finding that the loss was more than $2,500,000 but less than $7,000,000, the offense level was increased by 18 levels.  (ECF No. 51, ¶ 102).  A two-level increase was assessed because the offense involved sophisticated means.  (ECF No. 51, ¶ 103).  Finally, a one-level increase was assessed because Bolt was convicted under 18 U.S.C. § 1957.  (ECF No. 51, ¶ 104).  Due to these enhancements, Bolt's adjusted offense level was determined to be 28.  (ECF No. 51, ¶ 109).  After a three-level reduction for acceptance of responsibility was made, Bolt's total offense level was determined to be 25.  (ECF No. 51, ¶¶ 110-112).

Bolt's reported criminal history, occurring between 1982 and 1992, resulted in a criminal history score of zero, placing him in criminal history Category I. (ECF No. 51, ¶¶ 116-121). The statutory maximum term of imprisonment for Bolt's mail fraud and wire fraud convictions is 20 years each, and the statutory maximum term of imprisonment for Bolt's money laundering conviction is 10 years. (ECF No. 51, ¶ 151). Based upon a total offense level of 25 and criminal history Category I, Bolt's advisory Guidelines range was determined to be 57 to 71 months imprisonment. (ECF No. 51, ¶ 152).

On June 13, 2014, the Hon. Timothy L. Brooks, U. S. District Judge, gave notice of his consideration of an upward departure and/or an upward variance. (ECF No. 57). As set forth in the Court's notice, the possible basis for an upward departure, pursuant to USSG § 4A1.3(a)(1), was that Bolt's criminal history category substantially under-represented the seriousness of Bolt's criminal history and the likelihood that he will commit other crimes. (Id.).

Bolt appeared for sentencing on June 23, 2014. (ECF No. 62). Upon inquiry by the Court, Bolt expressed an understanding of the purpose of the sentencing proceedings, and he further advised the Court of his satisfaction with attorney Miller. (ECF No. 71, p. 7). Bolt confirmed his receipt of the initial and final PSR, stated he read them both, and informed the Court he conferred with his counsel regarding them. (ECF No. 71, p. 13). The Court summarized Bolt's objections to the PSR (ECF No. 71, pp. 14-19), and an evidentiary hearing was conducted concerning Bolt's objections regarding the loss amount and whether the offense involved use of sophisticated means.

After finding the loss amount exceeded $2,500,00, and that Bolt employed sophisticated means to commit the offenses, the Court overruled Bolt's PSR objections. (ECF No. 71, pp. 106-116). The Court then determined Bolt's total offense level was 25, that Bolt's criminal history score

-9-

placed him in criminal history Category I, and that the advisory Guidelines range was 57-71 months imprisonment.  (ECF No. 71, p. 123).

Finding that all of Bolt's prior convictions were more than 15 years old, but that they "have not deterred Mr. Bolt from continuing to engage in criminal conduct and, in particular, have not prevented him from continuing to invent and perpetrate fraudulent schemes," and that "he would be highly likely to recidivate if he were released or when he is released," the Court found that application of USSG § 4A1.3 to depart upward was appropriate based on the inadequacy of Bolt's criminal history category.  (ECF No. 71, pp. 125-26).  Given all of Bolt's prior convictions and the nature of those offenses, the Court concluded that a more appropriate criminal history category would be Category V, resulting in an advisory Guidelines range of 100 to 125 months imprisonment. (ECF No. 71, p. 127).  Following argument from counsel, and hearing Bolt's allocution, the Court imposed a sentence of 100 months imprisonment on each count of conviction, to run concurrently; three years supervised release on each count of conviction, to run concurrently; a fine in the sum of $50,000; payment of restitution in the amount of $2,514,082.28; and, a total of $300.00 in special assessments.  (ECF No. 71, pp. 141-43, 145).  Judgment was entered by the Court on June 24, 2014. (ECF No. 63).

Bolt timely appealed to the Eighth Circuit Court of Appeals.  (ECF No. 65).  Attorney Miller was appointed to represent Bolt in the appeal.  (ECF No. 68).  On appeal, Bolt contended the loss amount was improperly calculated; he challenged the two-level enhancement for use of sophisticated means; and, he challenged the Court's decision to depart upward.  (Gov't. Ex. 45).  The Eighth Circuit Court of Appeals affirmed Bolt's conviction and sentence by Opinion filed April 3, 2015. (ECF No. 73-1).  The Eighth Circuit's Mandate was issued on April 27, 2015.  (ECF No. 73).  Bolt

-10-

did not file a Petition for Writ of Certiorari with the United States Supreme Court.

On May 26, 2015, Bolt filed his Motion to Vacate under 28 U.S.C. § 2255.  (ECF No. 74). The motion raises five grounds for relief: (1) that he received ineffective assistance of appellate counsel when his counsel failed to raise an appeal issue - the alleged breach of the plea agreement - that had been properly preserved for appeal; (2) that he received ineffective assistance of trial counsel when his counsel "functioned as a government employee (FBI informant/cooperating witness), managed by the same case agent as was involved in movant's case, while simultaneously functioning as movant's defense lawyer"; (3) that he received ineffective assistance of trial counsel when his counsel "created a conflict of interest by devising a scheme to use his position of trust to engage in financial criminal activity that was contrary to the interests of movant during the overlapping periods of his representation"; (4) that his guilty plea "was the product of misadvice coupled with deficient performance by counsel"; and, (5) that the District Court failed to hold a *Holloway* hearing to adjudicate a question of conflict of interest that had been timely brought to its attention.

The United States filed its response in opposition to the motion on September 22, 2015. (ECF No. 87).

Petitioner did not file a reply to the Government's response.

The undersigned held an evidentiary hearing on September 20-21, 2017.  (ECF Nos. 134-135).  Seven witnesses appeared and testified for the Government: former AUSA Glen Hines; SA Cessario; SA Munns; Special Agent Layne Gimnich; Forensic Examiner Rebecca S. Passmore; Herbert Charles Southern; and, Andrew R. Miller.  Bolt appeared in person and testified on his own behalf.

-11-

## II. Discussion

"A prisoner in custody under sentence . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). A thorough review of Bolt's motion, the files and records of this case, and the evidence presented at the evidentiary hearing, conclusively shows that Bolt is not entitled to relief, and the undersigned recommends the denial and dismissal of Bolt's § 2255 motion with prejudice.

### A. Legal Standard for Ineffective Assistance of Counsel Claims

To prove a claim of ineffective assistance of counsel, a criminal defendant must demonstrate both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the deficient performance prong of the *Strickland* test, one must show that counsel's representation fell below the "range of competence demanded of attorneys in criminal cases." *Id*. at 688. Review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689. Moreover, "[s]trategic

choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690).  Courts also "do not use hindsight to question counsel's performance," but instead must analyze it according to counsel's situation at the time of the allegedly incompetent act or omission. *Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir. 1991).  If one fails to establish deficient performance by counsel, the court need proceed no further in its analysis of an ineffective assistance of counsel claim.  *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

To establish the prejudice prong of the *Strickland* test, one must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  The United States Supreme Court has clarified that the proper prejudice analysis is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

A defendant who pleads guilty waives all non-jurisdictional defects or errors.  *See United States v. Stewart*, 972 F.2d 216, 217-18 (8th Cir. 1992)  (citing *Hill v. United States*, 928 F.2d 303 (8th Cir. 1991)) and *Smith v. United States*, 876 F.2d 655, 657 (8th Cir. 1989).  Having solemnly admitted his guilt in open court, a defendant may only attack the voluntary and intelligent character of his guilty plea by showing that the advice he received from counsel was not within the range of competence demanded of attorneys in criminal cases.  *McMann  v. Richardson*, 397 U.S. 759, 771 (1970) (If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not "within the range of competence demanded of attorneys in criminal cases.").

The standard for determining the validity of a guilty plea remains whether it "represents a

-13-

voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970), citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969), *Machibroda v. United States*, 368 U.S. 487, 493 (1962), and *Kercheval v. United States*, 274 U.S. 220, 223 (1927). "While a guilty plea taken in open court is not invulnerable to collateral attack in a post conviction proceeding, the defendant's representations during the plea-taking carry a strong presumption of verity and pose a 'formidable barrier in any subsequent collateral proceedings.'" *Nguyen v. United States*, 114 F.3d 699, 703 (8th Cir. 1997) (quoting *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir. 1985)). A defendant has a heavy burden to overcome those admissions and show that his guilty plea was involuntary. *See Blackledge v. Allison*, 431 U.S. 63, 72-74 (1977).

### B.  Failure to Argue Breach of Plea Agreement on Appeal

Bolt's first ground for relief is that his appellate counsel, Miller, failed to argue on appeal that the Government breached the Plea Agreement during sentencing. (ECF No. 74, pp. 2-3). Bolt states the Government, having agreed not to argue for any sentence outside the Guidelines range, "breached the agreement by engaging in a prolonged, inflammatory and prejudicial argument" regarding Bolt's criminal history. (ECF No. 74, p. 3). Bolt notes that a timely objection and motion to withdraw the guilty plea was made by counsel and overruled by the Court, thus preserving the issue for appeal. (Id.). Bolt also argues the Government breached the plea agreement by deliberately leaking it to the public prior to the change of plea hearing "thereby foreclosing any reasonable opportunity for movant to not go through with a change of plea the following day," and when the Government argued before the appellate court to preserve a sentence that exceeded the Guidelines range. (Id.). These arguments have no support in the record.

-14-

### 1.  The Sentencing Hearing

During the sentencing hearing held on June 24, 2014, the Court first conducted an evidentiary hearing concerning Bolt's PSR objections, then the Court entertained argument on those objections. (ECF No. 71, p. 89).  AUSA Hines first addressed Bolt's objections to the loss amount and whether sophisticated means were used to commit the offenses.  He then addressed Bolt's third PSR objection that any inclusion of a record or criminal history prior to 1982 was unwarranted because of a finding by the U.S. Court of Appeals for the Tenth Circuit in *United States v. Bolt*, 776 F.2d 1463 (10th Cir. 1985).  AUSA Hines pointed out that a defendant's criminal history as reported in a PSR contains both convictions and arrests, stating "[t]his is the way the reports are prepared," and that "we're not asking the Court to do anything that is not typically done in each case."  (ECF No. 71, p. 95).  He argued Bolt had not submitted any legal precedent that would preclude the Court from considering the totality of Bolt's criminal history.  (Id.).  He argued that Bolt's 1982 conviction for similar conduct in Oklahoma "apparently did not deter him," that his 1992 theft offense conviction in Arkansas "apparently did not deter him," and he further made the following argument:

> "And so I'd respectfully submit this Court should be concerned for this particular defendant that those goals in [§] 3553, obviously general deterrents for similarly situated individuals so that they are aware of this defendant's criminal conduct and this Court should fashion an appropriate sentence to sufficiently deter those individuals. But specific deterrence, how do we deter this particular defendant." (ECF No. 71, pp. 95-96).

At that point Miller objected on the basis that he did not believe AUSA Hines' argument pertained to the objection regarding criminal history, and that:

> "The Court has put the defendant on notice properly that it is considering that.  The Government and Mr. Bolt have a plea agreement where it outlines the Government's responsibilities

regarding Mr. Bolt.  In that plea agreement it nowhere contains the fact that *now they're evidently arguing that the Court should do an upward departure based on that criminal history* and therefore I'm going to make a motion to withdraw that plea of guilty because the Government is not adhering to the plea agreement as outlined and the Court has.  So I'm going to make a motion to withdraw the guilty plea."  (ECF No. 71, p. 96) (emphasis added).

Miller testified at the evidentiary hearing that AUSA Hines' tone was "passionate" during his argument concerning Bolt's criminal history, that Miller "had heard enough of it," and "I wanted to stop him talking."  Judge Brooks acknowledged "it sounded like you [AUSA Hines] were arguing more about what is an appropriate sentence and what the Court should be able to take into consideration," and Judge Brooks then commented, "[p]erhaps he did jump the gun a little bit, but I haven't heard Mr. Hines contend or to take the position that he was doing anything that was inconsistent with the plea agreement. . ."  (ECF No. 71, p. 97).  The Court concluded, "I don't think that I heard him take any position that would serve as a predicate for your motion ... so I'm going to deny your motion."  (ECF No. 71, p. 98).

When argument was presented regarding what an appropriate sentence for Bolt should be, AUSA Hines first made clear, as the Government had in its Sentencing Memorandum (ECF No. 56, ¶ 4, fn. 3), that the Government had agreed to recommend a sentence within the Guidelines range determined by the Court.  (ECF No. 71, p. 131).  AUSA Hines then stated:

> "You have now determined that the guideline range is consistent with the PSR at 57 to 71 months.  And the Government has never deviated from that agreement, and I'm not going to do it now.  The Government respectfully recommends that this defendant be sentenced to a term of 71 months in prison."  (Id.).

During his allocution to the Court, Bolt actually agreed with AUSA Hines and said, "Your Honor, as odd as it may sound, I join Mr. Hines' argument as to the sentencing range, ... 57 to 71

-16-

months." (ECF No. 71, p. 134).  He reiterated this a few moments later, again stating: "... I think Mr. Hines has it right. I think his guideline range is correct."  (ECF No. 71, p. 136).

### 2.  No Breach of the Plea Agreement - No Deficient Performance

Nothing in the record evidences that the Government breached the Plea Agreement by recommending a sentence outside of the applicable Guidelines range.  Even Bolt agreed at sentencing with AUSA Hines' argument regarding the Guidelines range.  Consequently, there can be no deficient performance by Miller in failing to raise the issue on appeal.  It cannot be ineffective assistance of counsel not to raise a meritless argument. *Larson v. United States*, 905 F.2d 218, 219 (8th Cir. 1990).

Miller testified Bolt was transferred quickly after sentencing, but "he was confident" he and Bolt had conversations about the issues to pursue on appeal, and breach of the Plea Agreement was not one of those issues.  Miller ascribed to being in the school of thought that it is not good strategy to raise weak issues on appeal, as doing so can detract from other stronger issues.  Of course, such strategic choices made by counsel after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *Rice*, 449 F.3d at 897 (citing *Strickland*, 466 U.S. at 690).

Bolt also argues the Government breached the Plea Agreement by leaking it to the public prior to the change of plea hearing and by arguing on appeal to preserve a sentence that exceeded the Guidelines range.  Neither of these contentions have merit.  First, the Plea Agreement contains no provision requiring it to be sealed prior to the change of plea hearing.[7]  Second, the Plea Agreement specifically provides that the Government reserves the right to "defend all rulings of the District

---

[7] It remains unclear who "leaked" the Plea Agreement to the press prior to the change of plea hearing, but it was reported only in a business newspaper of limited circulation.

Court on appeal including those rulings which may be contrary to recommendations made or positions taken by the government in this plea agreement which are favorable to the defendant." (ECF No. 31, ¶ 24(e)).

Bolt's first ground for relief lacks both factual and legal support and should be rejected.

### C. Ineffective Assistance of Counsel Due to Conflict of Interest With Special Agent Cessario

Bolt's second ground for relief is that his trial counsel, Southern, "rendered ineffective assistance when he functioned as a government employee (FBI informant/cooperating witness), managed by the same case agent as was involved in movant's case, while simultaneously functioning as movant's defense lawyer." (ECF No. 74, p. 3). Bolt alleges "[t]his conflict was not reported to [Bolt] until after [Bolt] was indicted, and then, it was 'under reported' in that counsel initially represented that he was formally helping the FBI," and that "[t]his relationship with the FBI's agent chilled and deterred counsel from mounting any defense in the case eventually placing [Bolt] with no logical alternative except a guilty plea ..." (ECF No. 74, p. 4).

### 1. Rule of Professional Conduct

A concurrent conflict of interest exists if, *inter alia*, "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third party or by a personal interest of the lawyer." Arkansas Rules of Professional Conduct, Rule 1.7(a)(2). Notwithstanding the existence of a concurrent conflict of interest, a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a

claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and, (4) each affected client gives informed consent, confirmed in writing.  Arkansas Rules of Professional Conduct, Rule 1.7(b).

### 2.  No Conflict of Interest; Waiver

Careful consideration of the record and evidence demonstrates there was no conflict of interest; any conflict of interest and/or appearance of a conflict of interest was waived by informed consent in writing; and, Southern's relationship with SA Cessario did not adversely affect Southern's representation of Bolt in this case.

SA Cessario testified he first met Southern in early 2013 in connection with another investigation SA Cessario was working on. That investigation concerned a company, Highline Technologies ("Highline"), located in Farmington, Arkansas.  Southern had been involved with Highline in various capacities, but he had later sued Highline to recover unpaid compensation.  SA Cessario sought out Southern in connection with SA Cessario's  investigation of Highline, and he recalled that Southern provided "somewhat useful" information regarding Highline to him.  SA Cessario did not discuss helping Southern in any civil action against Highline.  SA Cessario also testified that Southern never shared any confidential information about Bolt with him, nor did Southern in any way compromise Bolt in their communications with each other.  The undersigned finds such testimony credible.

Southern testified Bolt contacted him shortly after the search warrants were executed on June 27, 2013.  He stated SA Cessario also contacted him on that date[8].  Southern met Bolt at the Situs

_____

[8] An e-mail from SA Cessario to Southern on June 27, 2013 at 9:57 a.m. confirms that SA Cessario asked Southern to call him.  (Gov't. Ex. 66).

location on West Poplar Street later on June 27, 2013 to discuss the execution of the search warrants, and he told Bolt about possibly having a conflict because of his ongoing involvement with SA Cessario in the Highline investigation.  At 10:25 p.m. on June 27, 2013, Southern sent an e-mail to SA Cessario to request receipts for the seized property and to inquire about return of the computers. SA Cessario responded to this e-mail the following morning.  (Gov't. Ex. 66).

Southern and Bolt met at Maestri's restaurant a couple of days later and, among other things, talked about the possible conflict again.  Southern testified Bolt told him during this meeting that Southern's relationship with SA Cessario might actually be beneficial to him.  Bolt did not recall, but did not deny, making such a statement.

After Bolt was indicted, Southern prepared and presented to Bolt a "Wavier (sic) of Conflict" form.  (Gov't. Ex. 20).  Both Southern and Bolt were uncertain about the date this document was prepared and signed[9], but both testified it would have been before Bolt was moved from Benton County to Washington County in late December, 2013.  In this document, Southern disclosed that SA Cessario contacted Southern in early 2013 "concerning a non-related case in which Herbert C. Southern is a material witness," and that "[e]ven though that case is not related in any way to the captioned case, the fact remains that Mr. Southern has a working relationship with S.A. Cessario which could be perceived as a conflict of interest in this case."  For his part, Bolt "waives any conflict that exists or may appear in this case due to the relationship between Herbert C. Southern and S.A. Cessario."  Bolt signed the waiver.

### 3.  No Chilling Effect on Counsel's Performance

A series of e-mail communications between SA Cessario and Southern was received in

---

[9] The document itself is undated.

evidence. (Gov't. Ex. 66[10]). Contrary to Bolt's belief, these communications offer little support for Bolt's claim that Southern's relationship with SA Cessario somehow compromised Southern's representation of Bolt. The e-mails do show that Southern was able to obtain some assistance from SA Cessario in obtaining information and documents, notably in between the execution of the search warrants on June 27, 2013 and Bolt's arrest on August 29, 2013, but Southern acknowledged that even that assistance was subject to the approval of the United States Attorney. For example, on July 1, 2013 at 11:52 a.m. Southern e-mailed SA Cessario to ask "[c]an I lay my grubbies on a copy of warrant affidavit." At 3:02 p.m. that afternoon SA Cessario responded "OK with me, let me check with the AUSA." Southern then inquired who the AUSA was, and SA Cessario informed him it was Glen Hines. Southern testified that upon advising Bolt of the receipt of this information and the affidavits for the search warrants Bolt stated, "see, I told you it would work out."

Further e-mail inquiries were made in late July and early August, 2013 about a possible meeting, and on August 8, 2013 at 10:36 a.m. SA Cessario advised Southern that AUSA Hines "wants to meet once we are done analyzing the computers ..." There are no further e-mail communications concerning Bolt until January 9, 2014, when AUSA Hines approached Southern about a proposal to stipulate to certain business records at trial.

Bolt points to an e-mail Southern sent to AUSA Hines, AUSA Jenner and SA Cessario on January 11, 2014 at 3:00 p.m. This was 18 days prior to the trial date set on January 29, 2014. According to Bolt, the inquiries made by Southern in this e-mail evidence a lack of preparation for trial. Southern testified he thought the Government was "changing things up," and he feared he had

---

[10] The exhibit is lengthy and is not paginated, so reference made to a specific e-mail contained within it is by date and time of the e-mail.

not been provided with everything, so it prompted this e-mail.  The issue of trial preparation will be addressed in the context of Bolt's fourth ground for relief, but for purposes of Bolt's claim that Southern's relationship with SA Cessario "chilled and deterred counsel from mounting any defense," this e-mail adds little to the analysis.  It may question when SA Cessario began his investigation of Bolt and the basis for doing so, but in no way does it evidence that Southern's connection to SA Cessaio led to deficient performance by Southern resulting in prejudice to Bolt.

In the language of Arkansas Rules of Professional Conduct, Rule 1.7(a)(2), no showing has been made of a "significant risk" that Southern's representation of Bolt was "materially limited" by Southern's "responsibilities" (as he had none) to SA Cessario.  Thus, the record fails to demonstrate the existence of an actual conflict of interest between Southern, SA Cessario, and Bolt.  Moreover, any conflict of interest, or even the appearance of a conflict of interest, was waived in writing by Bolt.  No legal authority has been cited by Bolt to establish the existence of a conflict of interest by virtue of Southern's relationship with SA Cessario, and Bolt has failed to present any credible and substantial evidence in support of his claim.  The undersigned finds no evidence that Southern's relationship with SA Cessario in the Highline matter caused Southern to provide deficient and ineffective representation of Bolt in this case.

Bolt's second ground for relief has no merit and should be denied.

### D.  Ineffective Assistance of Counsel Due to Conflict of Interest to Engage in Financial Criminal Activity

Next, Bolt claims Southern "was ineffective in his assistance when he created a conflict of interest by devising a scheme to use his position of trust to engage in financial criminal activity that was contrary to the interests of movant during the overlapping periods of his representation." (ECF

No. 74, p. 4). Bolt accuses Southern of "devising a scheme to divert assets of Situs Cancer Research Center into his personal control and custody," and that pursuant to his scheme Southern "received checks made payable to Situs," and "obtained personal property of Situs, sold or coverted (sic) it and refused to account for the property or funds when confronted." (ECF No. 74, pp. 4-5). Bolt avers effective assistance of counsel was "greatly impaired or destroyed by this conflict of interest and had it not been so, movant most likely would never have entered a guilty plea." (ECF No. 74, p. 5).

As noted above, a conflict of interest may arise when there is a significant risk that the representation of a client will be materially limited by a personal interest of the lawyer. Arkansas Rules of Professional Conduct, Rule 1.7(a)(2). Here, the evidence falls well short of showing that Southern engaged in any inappropriate financial activity regarding Bolt's company, Situs.

It is undisputed that no written attorney-client agreement was executed in connection with Southern's representation of Bolt in this case. Bolt testified Southern never provided an itemized statement of account for his services, and Southern agreed he never did so. Bolt stated Southern wanted a color copier and oscilloscope that belonged to Situs, and these items were given to Southern. Bolt also stated there was a lot of other personal property owned by Situs, i.e., an 8,500 square foot building "full of equipment," and that Southern sold all of this personal property at an auction without telling Bolt about it. Bolt acknowledged Southern told him the Government had seized many items of personal property. He testified Southern had been hired by Situs to represent its interests in the civil forfeiture proceedings.

On February 21, 2014, at 1:38 p.m., Bolt's girlfriend, Nikki Sailer, sent Southern an e-mail advising him that his representation of Situs was terminated. (Gov't. Ex. 66). In the e-mail, Ms. Sailer accused Southern of acting beyond the scope of his authority; that he "perhaps somehow

arranged for an auction of the property" without authorization, and if so, he "must reverse such sales and return Situs 'property' promptly;" and, an accounting was demanded.  Five days later, Bolt filed his *pro se* Motion to Appoint Counsel asserting that Southern had been dismissed.  (ECF No. 32). Southern then filed his Motion to Withdraw as Counsel on February 28, 2014.  (ECF No. 35).  The Court's Order granting Southern's motion to withdraw was entered on March 4, 2014.  (ECF No. 36).

Regarding the accusations that he took and sold Situs property without authorization, Southern testified he did "none of those things."  He said a "squabble" arose between Ms. Sailer and Bolt's mother, Marie Forehand.  The problem, according to Southern, was Ms. Sailer's belief that everything belonged to her.  Bolt had been supporting Ms. Sailer, and she continued to reside at the residence at 303 South Rife Drive, Rogers, Arkansas after Bolt's arrest and detention.  The three parcels of real estate had been seized and forfeited to the Government.  Southern, working with AUSA Ben Wulff (who was handling the civil forfeiture cases), facilitated arrangements to permit Bolt's mother to obtain access to the 303 South Rife Drive property "to quickly go into the home and collect the personal items."  (Gov't. Ex. 70).  Southern stated he drove by the property on that day, and he saw a large U-Haul truck there.  Southern denied any involvement in an auction of property belonging to Bolt or Situs.  Concerning compensation for his representation of Bolt, Southern stated he was paid $1,000 initially; that he later received a $4,200 insurance check given to him by Marshal Beery (a principal and director of Situs) (Gov't. Ex. 69), which was then indorsed over to him by Bolt; and, he was given an obsolete copier worth perhaps $2,000.

Notably, Nikki Sailer did not testify at the evidentiary hearing to provide support for Bolt's claim.  Nor did any of the other "principals" and/or "directors" of Situs (Marshal Beery and Ted Van

Sickle) appear to testify regarding the disposition of Situs property. Further, Bolt presented no documents or other credible evidence in support of his claim that Southern "used his position of trust to engage in financial criminal activity."

Bolt's third ground for relief completely lacks factual support and should be denied.

### E.  Ineffective Assistance of Counsel Due to Misadvice and Deficient Performance Rendering Guilty Plea Involuntary

In his fourth ground for relief Bolt claims his guilty plea "was the product of misadvice coupled with deficient performance by counsel, leading to the ineffective assistance of counsel at a critical stage of the proceedings." (ECF No. 74, p. 5). Bolt complains he did not receive adequate representation beginning with his detention hearing; the failure to challenge the search warrants; the failure to investigate Bolt's defense that he was the victim of an FBI undercover operation; and, the failure to prepare for trial, all leading to being "misadvised by counsel that a spurious guilty plea was the only viable option left to movant to avoid life imprisonment." (ECF No. 74, pp. 5-7). The argument fails to hold water.

### 1.  Bolt's Representations in the Plea Agreement

In his written Plea Agreement, Bolt admitted that he had read the agreement and carefully reviewed every part of it with his counsel. (ECF No. 31, ¶ 31(a)). Bolt represented he fully understood the agreement, and that no promises, agreements, understandings, or conditions had been made or entered into in connection with his decision to plead guilty except those set forth in the written Plea Agreement. (ECF No. 31, ¶ 31(b) and (c)). Bolt stated he was "satisfied with the legal services provided by defense counsel in connection with this plea agreement and matters relating to it." (ECF No. 31, ¶ 31(d)). Finally, Bolt confirmed he had entered into the Plea Agreement "freely,

voluntarily, and without reservation," and that his desire to plead guilty was "not the result of threats or coercion directed at the defendant or anyone connected with the defendant."  (ECF No. 31, ¶ 31(e)).

### 2.  Bolt's Representations During the Change of Plea Hearing

At his change of plea hearing on January 16, 2014, and after being duly sworn on oath, Bolt responded "[v]ery much so, Your Honor," when asked if he was fully satisfied with the service and legal representation he had received from Southern.  (ECF No. 37, pp. 2, 5).  Bolt's response was such that it prompted the Court to comment: "Well, don't brag on him too much. We have to get along with him after this case is over." (ECF No. 37, p. 5).  Bolt acknowledged an understanding of his right to be charged by an Indictment from a grand jury; his ability to waive that right and consent to being charged by an Information; and, that he had discussed those matters with his counsel. (Id.).  When asked if anyone made promises or threats to induce him to waive Indictment in this case, Bolt replied: "No, sir.  In fact, in the discussions we had I may have been the one that suggested the Information." (ECF No. 37, p. 6).  The Court found Bolt fully competent and capable of entering a knowing and voluntary Waiver of Indictment, and the written Waiver of Indictment was accepted and made a part of the record.  (ECF No. 37, p. 7).

Bolt  informed the Court his willingness to plead guilty was based upon discussions he had with Southern that resulted in the written Plea Agreement, and that he signed the Plea Agreement. (ECF No. 37, pp. 8-9).  Bolt stated the Plea Agreement contained his full understanding of what was negotiated with the Government, and he confirmed that he understood the agreement.  (ECF No. 37, p. 9).  He denied any promises or assurances were made by anyone, other than what is reflected in the agreement, to get him to execute the agreement.  (Id.).  He also denied anyone had attempted in

any way to force him to plead guilty. (ECF No. 37, p. 10). When asked, "[a]re you pleading guilty, sir, of your own free will because you are guilty?", Bolt responded, "[y]es, sir." (Id.).

The Court explained to Bolt, "[i]f you decide this afternoon or tomorrow or at any time before you are sentenced that you made a mistake and you should not have entered pleas of guilty but rather should have proceeded on to trial on your not guilty pleas, it may be difficult to undo what we are doing this afternoon." (ECF No. 37, p. 17). The Court further cautioned Bolt, "[s]o if there's any reluctance on your part whatsoever to enter pleas of guilty, then you should not do so," and Bolt stated his understanding. (ECF No. 37, pp. 17-18). Bolt admitted the Government could prove the factual basis for the guilty pleas, as did Southern. (ECF No. 37, p. 19). Bolt then pleaded guilty to Counts II and XI of the Superseding Indictment and to the one-count Information. (ECF No. 37, p. 20). The Court found Bolt fully competent and capable of entering informed pleas; that Bolt was aware of the nature of the charges and the consequences of his guilty pleas; that Bolt's guilty pleas were voluntary and knowing and supported by an independent basis in fact containing the essential elements of the offenses; and, the Court accepted Bolt's guilty pleas and adjudged him guilty of those offenses. (ECF No. 37, p. 20-21).

### 3. Bolt's Post-Change of Plea Actions

Six weeks after pleading guilty Bolt filed his *pro se* Motion for Appointment of Counsel and supporting Declaration (ECF Nos. 32, 34), raising for the first time allegations of a conflict of interest and dissatisfaction with Southern. Southern was permitted to withdraw on March 4, 2014 (ECF No. 36), and new counsel, Miller, was appointed on March 19, 2014 (Text Only Order).

According to Miller's testimony, Bolt initially wanted to withdraw his guilty pleas. The applicable standard and the ramifications of doing so were discussed "all the way up until

sentencing." Miller concluded there were no grounds for Bolt to withdraw his guilty pleas, and concerned about loss of acceptance of responsibility Bolt eventually decided not to move to withdraw his guilty pleas.

Although Bolt objected to the loss amount, the enhancement for using sophisticated means to commit the offenses, and the inclusion of his criminal history prior to 1982 in the PSR, Bolt did not object to the offense conduct section of the PSR. (ECF No. 51, ¶¶ 39-91). When asked about this during the evidentiary hearing, Bolt stated he did not remember reading the PSR and that he trusted attorney Miller to object appropriately. Miller, on the other hand, testified he carefully reviewed the PSR with Bolt, and that while Bolt "had some problems with it" Bolt decided not to make any objections to the offense conduct as reported in the PSR. I find Miller's testimony to be credible. Moreover, Bolt admitted at sentencing he read both the initial PSR and the final PSR and conferred with Miller regarding them. (ECF No. 71, p. 13). "A fact in a PSR to which the defendant has not specifically objected is a fact admitted by the defendant." *See United States v. Abrica-Sanchez*, 808 F.3d 330, 334 (8th Cir. 2015) (quoting *United States v. White*, 447 F.3d 1029, 1032 (8th Cir. 2006)).

### 4. Bolt's Evidentiary Hearing Testimony

Given that Southern had represented Bolt in the Shimoda case, Southern knew Bolt was not adverse to going to trial. According to Bolt, Southern would not specifically tell him what work or investigation he had done to prepare for trial, and instead, Southern "kept bringing up the idea of a plea agreement." Bolt faults Southern for failing to file a motion to suppress the evidence obtained during the searches. He asserts Southern told him there was a "glaring error" in the affidavits for the search warrants, i.e., no statement regarding the reliability of the cooperating witness (Gov't.

Ex's. 5, 7, 9, ¶ 28), and there was a question regarding where the thumb drive was located.  Bolt argues there was no tactical advantage to not filing a motion to suppress.  Bolt also contends Southern acted deficiently in failing to get the seized computers back.  Most of all, Bolt faults Southern for failing to prepare for trial.

Bolt testified that as trial drew near Southern told him he had not prepared for trial, and he presented Bolt with a proposed plea agreement.  When Bolt asked about witnesses and other trial preparations, he claims Southern responded "it wouldn't make any difference at this point."  A meeting was then had with AUSA Hines, AUSA Jenner, and SA Munns to discuss a possible plea agreement.  During a couple of private conferences with Southern during this meeting, Bolt claims Southern told him what to say "to sell this story to Judge Dawson."  Following the meeting, Bolt says Southern presented a lengthy Plea Agreement to him, and he signed it.  Bolt says Southern again counseled him about "selling it" to Judge Dawson on the day of the change of plea hearing.

Bolt asserted his factual innocence during the evidentiary hearing.  He asserted the facts he agreed to in the Plea Agreement are not true, and that he lied to Judge Dawson during the change of plea hearing.  He was motivated to do so because he was afraid and did not know what else to do because of Southern's failure to prepare for trial.  Bolt denied "being under anyone's spell," but he stated he "was at their mercy."  He characterized his position as "being between a rock and a hard place," and stated, "I was just a very frightened individual."  As for lying to Judge Dawson at the change of plea hearing, Bolt confessed "what I did was wrong and incorrect."

### 5. Bolt is a Sophisticated Criminal Defendant

In contrast to Bolt's testimony of being "a very frightened individual," both Southern and Miller characterized Bolt as being a very "sophisticated" criminal defendant.  Bolt's criminal history,

and particularly his history of having gone through three criminal trials in federal courts (two jury trials and one bench trial) and one jury trial in state court (ECF No. 51, ¶¶ 117-119, 128), supports that characterization.

The testimony of former AUSA Hines, SA Munns, and Southern is consistent in describing Bolt as playing an active role during the plea negotiations. Far from being "at their mercy," Bolt wanted the plea agreement meeting, and he "drove the train" during the meeting. As Bolt proudly acknowledged during the change of plea hearing, he came up with the idea of pleading guilty to an Information to the money laundering charge. AUSA Hines noted this reflected a high level of sophistication by Bolt, and AUSA Hines expressed his belief that Bolt clearly understood what he was doing. SA Munns recalled most of the discussion during the plea negotiations was by Bolt, and Bolt never expressed any dissatisfaction with Southern.

### 6. Southern's Preparations for Trial

After successfully representing Bolt to an acquittal following a jury trial in the Shimoda case, Southern maintained contact with Bolt. He assisted Bolt in civil litigation against the National Association of Securities Dealers in the wake of the Shimoda case, and they had other contact and conversations in the years following the Shimoda case. Southern described "a casual and relaxed relationship."

Bolt contacted Southern shortly after the search warrants were executed, and Southern recalled Bolt being upset that Nikki Sailer was interrogated. Southern met Bolt at Situs property on West Poplar Street to discuss execution of the search warrants. A couple of days later they met to further discuss Southern's representation. No formal attorney-client agreement was discussed, but Southern asked whether Bolt could "support" the case, which Southern estimated may cost $50,000

to $80,000, and Bolt assured Southern he could do so.  A couple of days after that meeting, Bolt informed Southern he would be "off the grid" for a while.  After Bolt's arrest, Southern learned Bolt had been hospitalized at some point during that time.

Southern prepared for the detention hearing by making inquiries with other attorneys (who had practiced before Judge Wiedemann), talking with the Probation Officer, and discussing the issue of detention with Bolt.  Southern learned that Judge Wiedemann would likely require a third-party custodian for Bolt to have any chance of being released.  Southern and Bolt discussed who might serve as a third-party custodian, and the only option was Nikki Sailer.  Among other witnesses, Southern had Ms. Sailer testify at the detention hearing.  Southern characterized Ms. Sailer as a poor witness.  Judge Wiedemann expressed some consternation with Ms. Sailer, telling Ms. Sailer "I'm sensing a little bit of an attitude from you here - and if you are wanting to act as a third-party custodian, you better get rid of that right now."  (ECF No. 20, p. 80).  Commenting on one of Ms. Sailer's responses, Judge Wiedemann told Ms. Sailer, "'I would probably turn him over to the correct people' means you are not a suitable third-party custodian."  (ECF No. 20, p. 81).  Southern regarded Bolt's request for a second detention hearing as frivolous because none of the circumstances had changed.

The Benton County Detention Center attorney-visitor log documents 21 visits Southern made to see Bolt at that facility.  (Gov't. Ex. 13).  Southern visited Bolt another 11 times while Bolt was housed at the Washington County Detention Center.  (Gov't. Ex. 65).  After Bolt's arrest on August 29, 2013, Southern fully reviewed the Criminal Complaint (ECF No. 1) with Bolt during a "quite lengthy" conference.  Southern well understood Bolt's belief that this case was a Government fabrication for Bolt having been acquitted in the Shimoda case.

Bolt told Southern of his theory that the Government had planted an undercover agent, "Leah Cleveland," at Situs, and that Leah Cleveland was involved in preparing the falsified and fraudulent donation agreements.  Southern did not see any evidence to support Bolt's theory of the defense as the case progressed, and his attitude about the case changed.  Southern testified Marshal Beery brought two suitcases to him around the time Situs was about to lose its rights to an aircraft hanger. Southern found numerous signature stamps inside one of the suitcases, including a signature stamp for "Leah Cleveland."  He stamped all of the signatures on a sheet of paper and confronted Bolt with it.  At first, Southern said, Bolt thought it was something the Government had provided which supported his theory of the case, but he became angry with Southern when Southern explained it had been prepared with the signature stamps he found.

Southern also concluded that the timing in Bolt's story regarding Leah Cleveland was not consistent with the evidence.  Bolt told Southern he met Leah Cleveland *after* the Shimoda case in 2006-2007.  During his review of Situs records, however, Southern came across two documents which directly contradicted what Bolt told him about Leah Cleveland.  One document was a Verification of Earnings form Bolt submitted to the Arkansas Department of Human Services on behalf of his wife, Yvonne Bolt.  The form is dated June 13, 2005, and is ostensibly signed by Leah Cleveland as "Employer/Payroll Clerk" for Shimoda Atlantic Oncology.  (Gov't. Ex. 67).  The second document is a series of canceled checks drawn on the Shimoda Atlantic checking account. Five of the canceled checks, dating from October 21 to November 8, 2004, are purportedly signed by "L. Cleveland."  (Gov't. Ex. 68).  Southern noted that the signatures differed, and some of the signatures matched the signature stamp he found.  These records heightened Southern's concern that Leah Cleveland was a fictitious person created by Bolt.  As Southern put it during the evidentiary

-32-

hearing: If Leah Cleveland was a Government plant after the Shimoda case in 2006-2007, then why was Leah Cleveland signing checks and forms for Shimoda in 2004 and 2005?

Perhaps one month after Bolt's arraignment on September 23, 2013, AUSA Hines and SA Cessario met with Southern to lay out the Government's case against Bolt. Southern then met with Bolt to review all of the evidence and documents he received from the Government, and he laid out for Bolt what the Government was coming at him with. Southern testified he had lengthy discussions with Bolt about how to present Bolt's theory of the defense. Southern consulted with local accountants to gain an understanding of "donation agreements" and to see if any of the accountants might help as potential witnesses. He considered the information he had from the Government, and specifically whether he could use cross-examination of Government witnesses to make his points. He ran down leads provided by Bolt, and they "went no where."

Southern testified he had no problem going to trial, as he had done for Bolt in the Shimoda case, but Southern had serious concerns about how to present Bolt's theory of defense.

Southern discussed a "spectrum-like analysis" of the case with Bolt, including the likelihood of conviction or acquittal. Bolt expressed a desire to meet with AUSA Hines to discuss a possible plea agreement, and the meeting was held at the jail on January 14, 2014. As previously mentioned, Bolt "drove the train" during the meeting. He signed the written Plea Agreement the following day, and the Plea Agreement was presented to the Court on January 16, 2014.

When questioned about his decision not to file a motion to suppress the evidence obtained in the searches and seizures, Southern relied on his view that "if it doesn't help, don't do it." Even if such a motion were successful, he still believed the Government had other substantial evidence against Bolt. He also felt there were other ways to present Bolt's defense, including use of motions

in limine and cross-examination of Government witnesses.  Such strategic decisions are virtually unchallengeable, *Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 690).  Further, in light of Bolt's voluntary and intelligent guilty pleas, there is no prejudice from Southern's decision not to pursue a motion to suppress.

When asked about the January 11, 2014 e-mail to SA Cessario (Gov't. Ex. 66), Southern stated it was sent due to his concern that the Government "might be changing things" at the last minute and his fear that the Government had not given him everything during discovery. Considering all of the evidence and testimony, the undersigned finds Southern's testimony to be credible, and it is apparent Southern had a firm grasp of the facts involved in the case leading into the plea negotiations.

Bolt also raised the issue of his physical and mental health prior to the plea negotiations, and while there was some concern about Bolt's self-reported symptoms in mid-November 2013, there is nothing in the record to establish that Bolt suffered from any cognitive deficit during the plea negotiations or during the change of plea hearing.

### 7. Bolt's Guilty Pleas Were Voluntary and Intelligent

The undersigned can discern no misadvice or deficient performance by Southern in his preparations for trial or negotiations toward a plea agreement.  Southern was faced with a client who, as his history strongly suggests, had become accustomed to presenting false and fraudulent information to others for personal benefit and gain.  Once before Southern had been successful in representing Bolt in a jury trial.  This time around, the Government's case was solid, and Bolt's defense that a Government undercover operation was used to ensnare him was fanciful.

A guilty plea is valid if it "represents a voluntary and intelligent choice among the alternative

courses of action open to the defendant." *Alford*, 400 U.S. at 31. Here, Bolt's decision to plead guilty represented his voluntary and intelligent choice among the alternatives available to him. It was not, as Bolt claims, the product of his counsel's failure to prepare for trial coupled with incompetent legal advice. Bolt was asked at the conclusion of the evidentiary hearing if he disagreed with Judge Dawson's findings at the change of plea hearing. Judge Dawson determined Bolt was "fully competent and capable of entering informed pleas in this matter," that he was "aware of the nature of the charges and the consequences of the guilty pleas," and that Bolt's "guilty pleas are voluntary and knowing and supported by an independent basis in fact." Bolt stated he had "no problem" with Judge Dawson's findings. That response is dispositive of his claim, and it should be rejected.

## F. Failure to Hold a *Holloway* Hearing Regarding Counsel's Conflict of Interest

Bolt's final ground for relief is his claim that the Court erred in failing to hold a *Holloway*[11] hearing to adjudicate the question of his counsel's alleged conflict of interest. (ECF No. 74, p. 7). Bolt asserts that he brought the issue of counsel's conflict of interest to the Court's attention by filing his Motion for Appointment of Counsel (ECF No. 32) on February 26, 2014, and that "the court should have held a Holloway hearing to fully explore the issues of conflict." (Id.; ECF No. 75, p. 27). This claim fails for three reasons: first, it was procedurally defaulted when it was not raised on direct appeal; second, the holding in *Holloway* is inapplicable to the present case; and, third, as discussed above, there has been no showing of a conflict of interest.

### 1. Procedural Default

The United States Supreme Court has "long and consistently affirmed that a collateral

---

[11] *Holloway v. Arkansas*, 435 U.S. 475 (1978).

challenge may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982) (internal citations omitted). Relief under § 2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).

After Bolt filed his Motion for Appointment of Counsel (ECF No. 32) on February 26, 2014, supported by his Declaration (ECF No. 34) filed the same date, his counsel, Southern, then filed a Motion to Withdraw as Counsel (ECF No. 35). By Order (ECF No. 36) entered on March 4, 2014, the Court permitted Southern's withdrawal, and new counsel, Miller, was subsequently appointed to represent Bolt on March 19, 2014. Bolt did not raise the issue of Southern's alleged conflict of interest up again prior to or at sentencing. As Miller put it during the evidentiary hearing, there was no discussion about taking any further action on the conflict of interest issue as Southern had already been permitted to withdraw. Bolt did pursue relief on direct appeal, but the issue of Southern's alleged conflict of interest was not an issue presented on appeal. Bolt procedurally defaulted the issue by failing to raise it on appeal.[12]

This procedural default may be excused only if Bolt "can show both (1) a cause that excuses the default, and (2) actual prejudice from the errors that are asserted." *Matthews v. United States*, 114 F.3d 112, 113 (8th Cir. 1997) (quoting *Bousley v. Brooks*, 97 F.3d 284, 287 (8th Cir. 1996)); *Apfel*, 97 F.3d at 1076; and, *Frady*, 456 U.S. at 167-68. "For cause to exist, the external

---

[12] Perhaps anticipating the adverse effect of his procedural default, Bolt characterized the issue as one of ineffective assistance of counsel at the evidentiary hearing. There is no question, however, that Bolt's § 2255 motion and supporting brief fault the Court, not counsel, for failing to hold a *Holloway* hearing. Accordingly, the issue has not been presented as one of ineffective assistance of counsel for failing to demand a *Holloway* hearing.

impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

Bolt makes no such showing here. He fails to demonstrate how the factual or legal basis for his *Holloway* claim was not reasonably available to him in time to pursue relief on direct appeal. He was clearly aware of the issue well before sentencing. He simply failed to take any further action regarding the claim after Southern was permitted to withdraw as his counsel. Further, there is no assertion by Bolt that some interference by government officials, or some external impediment, prevented him from raising his *Holloway* claim in the trial court or on direct appeal.

Since Bolt has not shown adequate cause to overcome the procedural bar in his case, the Court need not consider the issue of actual prejudice. *Ashker v. Class*, 152 F.3d 863, 871 (8th Cir. 1998) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)). Even so, Bolt has presented absolutely no new, reliable evidence to support his challenge to the voluntary and intelligent nature of his guilty pleas. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup v. Delo*, 513 U.S. 298, 316 (1995).

Bolt has failed to demonstrate "cause and prejudice" or a "miscarriage of justice" to overcome the procedural default of the *Holloway* claim he now asserts, and his claim should be denied.

### 2. *Holloway* is Inapplicable

Bolt's reliance on *Holloway* is misplaced. *Holloway* concerned the trial court's failure to take action when counsel, appointed to represent three defendants in a joint trial, moved well in

advance of the trial for the court to appoint separate counsel for each defendant because of the possibility of a conflict of interest in their cases. Here, there was no joint representation of multiple defendants as Bolt was the sole defendant in the case. Further, when Bolt and Southern alerted the Court to the potential conflict of interest, the Court permitted Southern to withdraw and new counsel was appointed to represent Bolt.

The rule announced in *Holloway* simply has no application to the present case.

### 3.  There Was No Conflict of Interest

As discussed in greater detail above, no showing has been made of a "significant risk" that Southern's representation of Bolt was "materially limited" by Southern's "responsibilities" to SA Cessario. The record fails to demonstrate the existence of an actual conflict of interest between Southern, SA Cessario, and Bolt. Further, any conflict of interest, or even the appearance of a conflict of interest, was waived in writing. Bolt cites no legal authority to establish the existence of a conflict of interest by virtue of Southern's relationship with SA Cessario, and Bolt failed to present any credible and substantial evidence in support of his claim.

Bolt's fifth ground for relief has no merit and should be denied.

### G.  No Certificate of Appealability is Warranted

A Certificate of Appealability may issue under 28 U.S.C. § 2253 only if the applicant has made a substantial showing of the denial of a constitutional right. A "substantial showing" is one demonstrating that reasonable jurists could debate whether the petition should have been resolved in a different manner or the issues presented deserved further proceedings even though the petitioner did not prevail on the merits in the court considering his case at present. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

In the present case, and for the reasons stated above, the undersigned finds that there is no substantial showing of the denial of a constitutional right, and a Certificate of Appealability should be denied.

### III.  Conclusion

For the reasons and upon the authorities discussed above, Bolt's claims are not supported by the record in this case.  Bolt's Motion, filed under 28 U.S.C. § 2255, should be **DISMISSED with PREJUDICE**.  It is further recommended that a request for a Certificate of Appealability be denied.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely written objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 10th day of October 2017.

/s/ *Mark E. Ford*

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE